**E-FILED**
Friday, 12 September, 2008  01:09:04 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RICKEY G. CASNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3289 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Rickey G. Casner (Casner) appeals from a final Decision of the Social Security Administration (SSA) denying his application for disability insurance benefits (DIB) under §§ 216(I) and 223 of the Social Security Act, 42 U.S.C. §§ 416(I), 423.  Casner brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Plaintiff's Motion for Summary Judgment (d/e 15)</u>; <u>Defendant's Motion for Summary</u>

Affirmance (d/e 17).[1]  For the reasons set forth below, Casner's Motion for Summary Judgment is allowed, and the Defendant's Motion for Summary Affirmance is denied.  The Decision of the SSA is reversed, and the matter is remanded for further proceedings.

STATEMENT OF FACTS

A.    Medical History

Casner was born on November 3, 1953.  He is a high school graduate and has past relevant work as a greenhouse worker, material handler, stockman, and janitor.  Administrative Record, See Remark, dated May 24, 2007 (A.R.) at 37. In 1985, Casner suffered a lung injury after exposure to anhydrous ammonia and was hospitalized for seven days.  Casner concedes that he did well for a considerable period of time thereafter.  In 1996 and again in 1997, however, Casner experienced a pneumothorax, or collapsed lung.  He was treated surgically by Jeffrey Christy, M.D., who performed a wedge resection of the bullae on the lung and a subsequent pleurodesis,

---

[1]The Court notes that Casner originally filed a Motion for Summary Judgment (d/e 11) with a Motion for Leave to File Excess Pages (d/e 13), requesting leave to file an accompanying Memorandum of Law that exceeded the page limitations set by local rule.  After Magistrate Judge Evans allowed the Motion for Leave to File Excess Pages, Casner refiled an identical Motion for Summary Judgment (d/e 15).  Therefore, in light of Plaintiff's filing of docket entry 15, Plaintiff's original Motion for Summary Judgment (d/e 11) is denied as moot.

which is a procedure designed to prevent fluid build-up between the membranes surrounding the lungs.  A.R. at 279.

Casner's primary care physician is David Kiel, M.D.  On December 6, 2001, Dr. Kiel admitted Casner to St. Vincent Memorial Hospital for evaluation and therapy relating to pneumonia.  A.R. at 477.  Dr. Kiel noted that the pleurodesis had failed.  According to Dr. Kiel's notes, Casner was in the midst of a divorce, employed, and able to care for his daily needs without difficulty.  Id.  M. B. Prabhu, M. D., performed a pulmonary consult on Casner on December 10, 2001.  A.R. at 468.  Dr. Prabhu recommended a bronchoscopy for evaluation of the airways and bronchial washings, both of which were subsequently performed.  A.R. at 465.  The bronchoscopy revealed clear airways.  Casner improved and was discharged on December 13, 2001.  Subsequent radiology reports noted improvement in his left lung.  A.R. at 458-60.

Casner returned to see Dr. Kiel in August 2002, complaining of pain in his right chest.  A.R. at 555.  Dr. Kiel noted no shortness of breath and a physical examination revealed a clear chest.  Casner declined a chest x-ray to rule out pneumonia.  Dr. Kiel directed light duty at work for a week and a follow-up as necessary.  Id.

Casner returned to Dr. Kiel in November 2002 with a cough, cold congestion, sore throat, and runny nose. A.R. at 553. Casner informed Dr. Kiel that he was afraid he was going to get pneumonia, but Dr. Kiel noted that Casner's chest was clear.

Casner was examined by Wayne Manson, M.D., on February 1, 2003, complaining of a severe sore throat associated with a fever. A.R. at 552. Dr. Manson noted that Casner's chest was clear. Dr. Manson prescribed antibiotics and directed Casner to return if he did not improve. Casner went to Dr. Kiel's office on February 4, 2003, with a persistent deep cough. A.R. at 551. Dr. Kiel noted that Casner's lungs were clear and concluded that Casner was suffering from bronchitis. Dr. Kiel ordered a chest x-ray to check for an infiltrate. The x-ray was performed, and an infiltrate was found. A.R. at 547. Dr. Kiel examined Casner on February 18, 2003, noting an occasional cough and some dyspnea, or shortness of breath, with activity. Dr. Kiel ordered new prescriptions and directed Casner to follow-up in two weeks.

By February 28, 2003, Casner reported continued chest pain and significant fatigue. A.R. at 546. Dr. Kiel's nurse practitioner noted that Casner's lungs were clear with no adventitious sounds and no areas

diminished.  She advised Casner that he would have to see Dr. Kiel if his pain persisted at a level that he believed necessitated continuation of narcotic pain medication.

Casner returned to Dr. Kiel in May 2003, due to significant weight loss, elevated liver functions, and cough with dyspnea on exertion.  A.R. at 544.  Dr. Kiel noted that Casner's chest was clear and ordered additional tests and a chest x-ray.  Casner returned for a follow-up on May 27, 2003.  A.R. at 542.  At this time, Casner reported that he was suffering from anxiety, chest pain, dizziness, and lightheadedness.  Casner stated that he was feeling so bad that he should be on disability and reported that "[l]uckily, he got laid off work and has not had to deal with that."  Id.  Dr. Kiel assessed Casner as having a possible slight hyperventilation syndrome.

Casner saw Dr. Kiel's nurse practitioner on June 26, 2003, seeking refills of his medications.  A.R. at 540.  Casner reported continued chest wall pain and episodes where he felt like he could not catch his breath.  The nurse assessed Casner for chest wall pain, anxiety, and possible hyperventilation and directed him to follow-up with Dr. Kiel in two weeks.  Casner visited Dr. Kiel on July 21, 2003.  A.R. at 539.  Dr. Kiel noted that Casner was doing fairly well as long as he avoided work in a hot, dusty, dirty

environment which required a lot of lifting.  According to Dr. Kiel's notes, Casner had applied for disability because he was unable to perform this type of work at his former employer.  Casner reported that he had been doing some roofing for his brother-in-law, which caused him considerable pain, but paid well.  Dr. Kiel directed Casner to continue with an Albuterol inhaler before activity and added a dose of Advair inhaler.

Dr. Kiel saw Casner on August 14, 2003, but no physical exam was conducted.  A.R. at 537.  Casner complained of pain in the left upper chest area and asked to see a specialist regarding removal of scar tissue.  Dr. Kiel continued Casner's medications and ordered a referral to Dr. Lanie Eagleton.  After the August 2003 visit, Dr. Kiel completed a respiratory disability report form for Casner, noting that Casner had pulmonary fibrosis, with wheezing and rhonchi.  A.R. at 211.  When asked to describe Casner's ability to do work-related activities including sitting, standing, moving about, lifting and carrying, Dr. Kiel stated only that Casner exhibited dyspnea, or shortness of breath, on exertion.  A.R. at 212.

On August 27, 2003, Casner was examined by Joseph Henkle, M.D. A.R. at 292.   Casner reported frequent pneumonia, recurrent pneumothoraces, cough, shortness of breath, and "on and off chest pain."

Id.  Dr. Henkle characterized his physical examination of Casner as "unremarkable."  Id.  Dr. Henkle considered the results of pulmonary function tests and of a CT scan, which Dr. Henkle described as revealing significant abnormalities.  Dr. Henkle characterized Casner's lung function as "surprisingly good."  Id.  Casner returned to Dr. Henkle for follow-up on September 17, 2003.  A.R. at 290.  Dr. Henkle noted some improvement in Casner's overall respiratory symptoms with Cipro.  Despite noted lung abnormalities, Dr. Henkle characterized Casner's lung function as normal after pulmonary function tests.  Dr. Henkle proposed a treatment plan of anti-pseudomonal antibiotic therapy on an intermittent basis in an attempt to control Casner's symptoms.

Casner returned to Dr. Henkle in October 2003.  A.R. at 286.  Dr. Henkle noted that after some initial improvement with Cipro, Casner appeared to have returned to baseline.  Casner did not have a cough, but reported dyspnea on exertion and intermittent chest pain.  Dr. Henkle discontinued the Cipro and began Zithromax.  Dr. Henkle referred Casner for a cardiopulmonary exercise test, which was performed on January 13, 2004.  A.R. at 328.  Casner performed the test for 9.3 minutes before he had to stop due to burning chest pain.  The test revealed that Casner's

overall pulmonary response to exercise was normal.

In October 2003, Casner was examined by SSA consulting psychologist Dolores Trello.  A.R. at 188.  Trello noted that Casner had suffered from depression for the past year but was experiencing some improvement with the anti-depressant medication Celax.  Casner reported that generally he woke up at 6:00 a.m. and went to bed at 11:00 p.m., but that his sleep varied and he needed Xanax to fall asleep.  Casner stated that he was able to cook, bathe, do laundry, purchase food, drive, pay bills, make change, and handle a budget.  Casner informed Trello that he could slowly do house chores and that his ability to concentrate on tasks varied with his health.  In assessing Casner, Trello noted that he was cordial and responsive.  She rated his concentration as fair, assigned a global assessment of functioning score of 50, and determined that Casner suffered from recurrent major depression of moderate severity.

On November 6, 2003, SSA consultant Carl Hermsmeyer, Ph.D., completed a psychological assessment of Casner's file.  A.R. at 224.  Dr. Hermsmeyer assessed Casner as suffering from moderate major depression, recurrent.  A.R. at 227.  According to Dr. Hermsmeyer, Casner's mental condition resulted in the following functional limitations: mild restriction

of activities of daily living, moderate difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace.  A.R. at 234.  Dr. Hermsmeyer noted no episodes of decompensation of extended duration.  It appears that Dr. Hermsmeyer's assessment was reviewed and affirmed in May 2004 by an M.D., whose name is not clear from the record.  A.R. at 224.

In December 2003, Casner was evaluated by SSA consultant Dr. Vittal Chapa.  A.R. at 198.  Dr. Chapa found Casner's lungs to be clear.  Dr. Chapa noted that Casner was alert, oriented, and in good contact with reality.   Dr. Chapa stated an impression that Casner suffered from "[s]hortness of breath secondary to bronchiectasis, emphysema, and pulmonary fibrosis."  A.R. at 200.  Dr. Chapa noted that Casner became short of breath with minimal exertion.  Pulmonary function tests were performed and were essentially normal.  A.R. at 202-05.

In December 2003, SSA consultant William Conroy, M.D., completed a Physical Residual Functional Capacity Assessment for Casner.  A.R. at 216.  Dr. Conroy concluded that Casner maintained the residual functional capacity for light work with some restrictions.  A.R. at 223.  Dr. Conroy determined that Casner could occasionally lift twenty pounds, frequently lift

ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  A.R. at 217.  According to Dr. Conroy, Casner could never climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs.  A.R. at 218.  Dr. Conroy also noted that Casner could occasionally balance, stoop, kneel, crouch, and crawl.  Id. With respect to environmental limitations, Dr. Conroy determined that Casner could withstand unlimited exposure to extreme cold and heat, but that he should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation, based on what Dr. Conroy characterized as "severe pulmonary damage from anhydrous ammonia."  A.R. at 220.  In April 2004, Victoria Dow, M.D., reviewed the medical evidence and Dr. Conroy's assessment.  A.R. at 216.  She determined that Dr. Conroy's assessment should be affirmed.

In late August 2004, Casner was seen by Memorial Counseling Associates for mental health counseling and was assessed as suffering from recurrent major depression, dysthymic disorder, and alcohol dependence in full remission.  A.R. at 277.

On October 13, 2004, Casner was treated at the emergency room after his wife observed him "acting strangely at home" after consuming whiskey,

beer, and possibly extra Methadone tablets.  A.R. at 437.  The treating doctor, David Harvey, M.D., noted that Casner's chest was clear.  On October 14, 2004, Casner was admitted to a partial hospitalization program for intensive mental health treatment.  A.R. at 247-77.  Casner continued counseling with Memorial Counseling Associates through January 2005.  A.R. at 299-307.

Also in October 2004, Casner was examined by Dr. Lanie Eagleton.  A.R. at 280.  Casner complained of shortness of breath, coughing, and chest pain.  Dr. Eagleton noted that Casner had taken a pulmonary exercise test which was within normal limits, other than the fact that Casner stopped the exercise because of chest pain.  According to Dr. Eagleton, Casner's chest was clear bilaterally on examination, although the doctor noted left chest scar.  Dr. Eagleton assessed Casner as suffering from upper airway infection.  Dr. Eagleton referred Casner for evaluation of his heart condition in an effort to rule out the heart as the cause of the chest pain.  A heart catheterization was subsequently performed and the findings were normal with a left ventricular  function estimate of fifty-five percent.  A.R. at 309.

On November 23, 2004, Casner returned to Dr. Christy, his surgeon, on referral from Dr. Kiel.  A.R. at 279.  Dr. Christy characterized Casner's

lung disease as "severe."  Id.  Dr. Christy noted lung abnormalities after reviewing a CT scan.  According to Dr. Christy, Casner had an increased risk for recurrent infectious process due to his bronchiectasis; however, Dr. Christy did not believe that Casner exhibited destruction to such a degree that additional surgery would be recommended, especially in light of Casner's lung scarring and the fact that he was deemed a high risk surgical candidate.

By January 1, 2005, Casner was again suffering from pneumonia.  A.R. at 408.  An x-ray of his chest revealed no change in the right basilar infiltrate.  A.R. at 432.  The radiologist noted that he could not exclude mild worsening of the infiltrate at the left base.  Casner was admitted to the hospital for three days.  Discharge notes indicate that his hospital course was unremarkable and that, after receiving antibiotics, Casner began breathing better.  A.R. at 408.  Another x-ray, taken January 24, 2005, revealed scattered areas of fibrosis and a new ill-defined area of increased opacity over the left lung base, identified as possibly either an acute infiltrate or an artifact.  A.R. at 430.

Casner underwent a pulmonary function test in February 2005.  A.R. at 428.  Dr. Prabhu's analysis of the test results indicated reduced diffusing

capacity and slightly reduced flow volumes but normal lung volumes.  A.R. at 405.  Dr. Prabhu noted that the flow volume loop revealed that Casner made a suboptimal effort at the test but that flow rates nevertheless appeared to fall within normal limits.

Casner presented to Dr. Kiel on April 1, 2005, complaining of deep cough and shortness of breath at times.  A.R. at 500.  Dr. Kiel assessed Casner as suffering from either pneumonia or a lower respiratory infection. A chest x-ray on April 1, 2005, revealed increased infiltrates bilaterally. A.R. at 404.  Another chest x-ray on April 9, 2005, revealed partial clearing of the infiltrates although significant fibrosis remained.  A.R. at 403.  The radiologist characterized Casner's chronic obstructive pulmonary disease (COPD) as "moderately severe"  Id.  At this point Dr. Kiel noted that Casner could be suffering from pneumonia, an atelectasis (collapse of lung tissue), or, more likely, pulmonary fibrosis.  A.R. at 499.  A chest x-ray on April 15, 2005, revealed a slight worsening of infiltrate on the left side . A.R. at 399.  However, by May 4, 2005, Dr. Kiel characterized Casner's breathing as "fairly decent."  A.R. at 497.

On May 27, 2005, Casner returned for follow-up with Dr. Kiel.  A.R. at 495.  Casner reported that he had been working part-time and that he

was taking five or six Methadone pills a day when working, instead of the prescribed four.  Dr. Kiel emphatically explained to Casner that if he went over one more time, Dr. Kiel would cut him off from Methadone completely and Casner would "have to get by on his own accord."  Id.  When Casner returned to see Dr. Kiel in June 2005, however, Casner had exhausted his Methadone prescription three days early.  A.R. at 494.  Despite his prior warning, Dr. Kiel continued Casner's medications.

On August 12, 2005, Casner saw Dr. Kiel for COPD, chronic pain, and depression.  A.R. at 492.  Dr. Kiel noted that Casner was "doing fairly well" and working periodically for his brother as a gopher, although Dr. Kiel recognized that Casner was "unable to do very much."  Id.  On August 31, 2005, Casner called Dr. Kiel's office to request additional Methadone prior to his regular refill.  According to Casner, he had been working outside which caused him to use more Methadone.  A.R. at 492.  The office notes indicate that it was too soon for a refill.  Casner called again on September 1, 2005, to request a Methadone refill and was informed he could not get a refill before September 8 or 9, 2005.  A.R. at 491.  Casner called again on September 6, 2005, to request the Methadone refill.  From the office notes, it appears that it was refilled at this time.  Id.

14

In September 2005, Casner returned to Dr. Kiel for a follow-up. A.R. at 490. Dr. Kiel noted that Casner was "basically unable to do much of anything" and was taking five doses of 10 mg Methadone a day. Id. Dr. Kiel noted that Casner "gets dyspneic with any exertion he does and more chest pain as well." Id. Dr. Kiel completed a disability assessment for Casner. A.R. at 386-393. Dr. Kiel opined that Casner's low effusion capacity coupled with his chronic obstructive pulmonary disease and partial lung resection made it "quite difficult" for Casner to perform anything other than sedentary work. A.R. at 386. Dr. Kiel further stated his belief that Casner would not be able to maintain forty hour work weeks, even with sedentary work, without experiencing difficulties secondary to his chronic obstructive pulmonary disease. Id. According to Dr. Kiel's analysis, Casner "has been capable of performing sustained SEDENTARY work on a regular and continuing basis . . ." but he "has not been capable of performing sustained LIGHT work on a regular and continuing basis . . . ." A.R. at 387-88. Dr. Kiel set out express limitations on Casner's ability to sit, stand, walk, lift, stoop, kneel, and crouch. A.R. at 389-392. Dr. Kiel indicated that Casner had been subject to these limitations at this severity since 2001. A.R. at 392.

Another pulmonary function test was administered in early October 2005.  A.R. at 395.  Dr. Prabhu's analysis of the test revealed reduced capacities, although he noted improvement in the diffusing capacity.  Dr. Prabhu opined that Casner "made a very poor effort at the pre bronchodilator test."  Id.  Dr. Prabhu concluded that the tests evidenced COPD with predominately involvement of Casner's airways.

B.    Administrative Hearing

Casner filed his application for DIB on July 28, 2003.  Casner originally asserted that he had become disabled on September 30, 2002, but he subsequently amended his onset date to November 3, 2003, the date of his fiftieth birthday.  Casner's claim was denied initially and on reconsideration.  Casner requested an administrative hearing, which was held June 14, 2006.  The Administrative Law Judge (ALJ) heard testimony from Casner and vocational expert Dr. James Lanier.

Casner testified that he took Methadone for pain in his chest and lungs.  According to Casner, he experienced this pain "[j]ust about every day," but that the Methadone seemed to help.  A.R. at 38.  Casner stated that the Methadone interfered with his activities by making it hard to concentrate and by making him feel drowsy, tired, and irritable.  A.R. at 34.

Casner testified that he had difficulty standing or walking, especially when it was too hot or too cold.

Casner explained that his work in August 2005, for his brother-in-law, included handing and fetching tools and holding rulers for drywall installation. Casner testified that he worked for a couple days at a time for a period up to four months. Casner stated that he helped his brother-in-law pour concrete in December 2004, by holding and guiding the shoot that the concrete comes out. Casner testified that his brother-in-law paid him for his work. According to Casner, other than the work for his brother-in-law, Casner had not worked since November 2003.

Casner testified that he got up between 6:00 a.m. and 7:00 a.m. and went to bed about midnight. Casner stated that he swept, vacuumed, prepared meals, and helped with the shopping. Casner testified that he did not do laundry or yard work, but that he could bathe and dress himself. Casner stated that he had a driver's license, but drove only about 100 miles a month. Casner reported that his hobbies were reading, gardening, and fishing. He testified that he attended Alcoholics Anonymous meetings twice a week and visited with family. Casner also stated that he watched quite a bit of television. Casner testified that he could do housework or gardening

for approximately two hours while pacing himself.  According to Casner, if he overdoes it, he pays for it at night by wheezing and coughing.

Upon examination by his attorney, Casner testified that, three or four times a week he would cough to the point that his hand would shake and, on some occasions, he would experience dry heaves.  Casner explained that if it were too hot or too cold, or if he over exerted himself, he could feel wheezing, rattling, and tightness in his chest.  Casner stated that, in August 2005, when he was working for his brother-in-law, he was taking extra Methadone.  According to Casner, Dr. Kiel told him to cut back or to just stop working.

Casner testified that he could lift and carry a grocery bag, but that if he tried to do that consistently for two or three hours he would feel pain and pressure in his chest and experience wheezing and coughing.  Casner stated that he could walk three blocks to the library in good weather, but that if it were above 80 degrees or below 30 degrees he would not be able to walk there.  Casner stated that he had bad days approximately two to three days out of a week, during which he could actually lose his breath walking to the bathroom and brushing his teeth.  According to Casner, on bad days he would stay in his room, watch television, use his inhalers, and

relax.  Casner testified that he tried to mow the yard and that after fifteen minutes his chest hurt so badly that his hands were shaking.  According to Casner, the winter of 2005-2006 marked the first time in eight or nine years that he had not had pneumonia.  Casner further testified that he would lose concentration while driving.

Vocational expert Dr. James Lanier also testified.  The ALJ asked Dr. Lanier to assume an individual with Casner's past employment history who was limited to lifting or carrying no more than ten pounds frequently or twenty pounds occasionally, who has to avoid temperature extremes and concentrated respiratory irritants, who cannot climb ladders, ropes or scaffolds and can only occasionally stoop or crouch, and who is limited to simple repetitive tasks due to deficits in maintaining concentration.  Dr. Lanier testified that such an individual would be unable to perform any of Casner's past work, but would be able to perform the following jobs at the following levels: ticket checker (sedentary), interviewer (light and sedentary), information clerk (light and sedentary), shipping and receiving clerk (light), and general office clerk (light and sedentary).[2]  According to

---

[2]On examination by Casner's attorney, Dr. Lanier explained that the <u>Dictionary of Occupational Titles</u> classified all of these positions, except that of ticket checker, as light work.  Dr. Lanier testified that he divided the number of positions into light and

Dr. Lanier, these positions existed in significant numbers in Illinois and in the national economy.  Dr. Lanier was asked whether weekly unscheduled absences from work would interfere with the hypothetical individual's successful performance of such jobs.  He testified that such absences would indeed interfere with performance and agreed that such absences would "[p]retty much rule out competitive employment."  A.R. at 51.  Dr. Lanier testified that the same result would occur if the individual were to miss part of a workday once a week.  Dr. Lanier further testified that, in the identified positions, an individual who was off-task for fifteen percent of the workday would eventually be terminated.

C.    The ALJ's Decision

The ALJ issued a written Decision, concluding that Casner was not disabled within the meaning of the Social Security Act because he was capable of performing a significant number of jobs in the national economy consistent with his age, education, past work experience and residual functional capacity.  A.R. at 15-22.  In reaching this conclusion, the ALJ followed the five-step analysis set out in 20 C.F.R. § 404.1520.  The

---

sedentary based on information contained in the Occupation Employment Quarterly, a standard publication that is regularly used in the field of vocational counseling and placement.

analysis requires a sequential evaluation of: (1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Casner met his burden on the first two steps of the analysis, noting that Casner's history of pulmonary fibrosis, emphysema, and anxiety in combination constituted a severe impairment. The ALJ concluded that Casner failed to demonstrate that any impairment was severe enough to equal an impairment listed on Appendix 1 (step three). The ALJ then considered whether Casner retained the residual functional capacity to perform his past relevant work (step four). The ALJ

concluded that Casner retained the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, based on his reported daily activities.  A.R. at 19.  The ALJ found that Casner could not climb ladders, ropes or scaffolds and could only occasionally stoop or crouch, due to back pain.  The ALJ concluded that Casner could not have concentrated exposure to respiratory irritants and that he had difficulty with exposure to temperature extremes.  Given Casner's difficulty with concentration and attention, the ALJ found that he would benefit from simple, repetitive instruction.  Based on this residual functional capacity, the ALJ determined that Casner had met his burden at step four in establishing that he was unable to perform his past relevant work.

The ALJ proceeded to step five, noting that, at this point, the burden shifts to the SSA to establish that Casner could perform some type of gainful employment that exists in the national economy.  The ALJ recognized that Casner, a high school graduate, was closely approaching advanced age and did not have skills that were transferable to skilled or semi-skilled functions of other work.  Given this vocational profile, if Casner's residual functional capacity limited him to sedentary work, Rule 201.12 of 20 C.F.R. § 404, Subpt. P, App. 2 would necessitate a finding of

disabled.  The ALJ, however, found that Casner could perform routine light work with some restrictions, and he expressly rejected Casner's assertion that he would be absent from work more than once a week as unsubstantiated by the medical record.  Relying on vocational expert Dr. Lanier's testimony, the ALJ determined that Casner could perform the following jobs: ticket-checker at the sedentary level, interviewer at the light or sedentary level, information clerk at the light or sedentary level, shipping/receiving clerk at the light level, and general office clerk at the light or sedentary level.  The record evidence established that each of these jobs provided a significant number of employment opportunities within the state of Illinois and in the national economy.  Thus, the ALJ concluded that Casner was not disabled under the Social Security Act, and Casner's claim for DIB was denied.

D.   The Appeals Council

Casner appealed the ALJ's Decision to the SSA Appeals Council, asserting that the Decision was not based on substantial evidence and was contrary to the law.  A.R. at 8.  Specifically, Casner asserted that the ALJ: (1) failed to give appropriate weight to Dr. Kiel's opinion as to Casner's residual functional capacity; (2) made findings that were unsupported by

the record evidence; and (3) erroneously failed to use the medical-vocational grid rules as a framework for decision-making.  A.R. at 8-9.  The Appeals Council denied Casner's request for review, stating that it found "no reason under [its] rules to review the Administrative Law Judge's decision."  A.R. at 5.  Thus, the ALJ's Decision became the final decision of the SAA.  Casner then timely filed the Complaint (d/e 1) in the present case.

ANALYSIS

This Court will reverse the Decision of the SSA if that decision is not supported by substantial evidence or results from an error of law.  Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  This Court reviews the ALJ's factual findings to determine whether they are supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The issue before this Court is whether the ALJ's findings were supported by substantial evidence and not whether Casner is disabled.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003).  The ALJ must at least

minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).  This Court must not reweigh the evidence and should affirm as long as the ALJ "identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Giles ex rel. Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007).  If, however, "the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  Id. (internal quotations and citation omitted).

As Casner correctly points out, this case could ultimately be decided based on the difference between a finding that he retains the capacity to perform light work versus a finding that he has the capacity to perform only sedentary work.[3]  As the ALJ noted, given Casner's vocational profile, if his

_____

[3]Under SSA regulations:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.  With respect to light work, the regulations provide as follows:

residual functional capacity limited him to sedentary work, Rule 201.12 of 20 C.F.R. § 404, Subpt. P, App. 2 would necessitate a finding of disability. The ALJ, however, determined that Casner retained the residual functional capacity for light work with certain restrictions and went on to consider whether Casner could perform a significant number of jobs in the economy. Casner asserts that the ALJ's assessment of his residual functional capacity included both errors of law and of fact.  He seeks reversal of the SAA's Decision, arguing that the ALJ made findings of fact with respect to Casner's physical and mental functioning that are not supported by the record evidence.  Casner further asserts that the ALJ failed to give appropriate weight to Dr. Kiel's opinion that Casner had the capacity to perform only sedentary work at best.  Finally, Casner contends that the ALJ erred at step five because, with a residual functional capacity properly limited to sedentary work, the Medical-Vocational Grid Rules necessitate a finding of disabled.  The Court addresses each of these arguments in turn.

---

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

A.      The ALJ's Residual Functional Capacity Assessment

In evaluating Casner's residual functional capacity, the ALJ determined that Casner retained the capacity to perform light work with some restrictions.  Specifically, the ALJ found that Casner could lift and carry up to twenty pounds occasionally and up to ten pounds frequently based on his reported daily activities.  A.R. at 19.  The ALJ determined that Casner could not climb ladders, ropes, or scaffolds and could only occasionally stoop or crouch.  The ALJ found that Casner must avoid concentrated exposure to respiratory irritants.  Additionally, in his written decision, the ALJ deemed Casner's difficulty with exposure to temperature extremes "reasonable considering his condition."  A.R. at 19.  The Court notes that the hypothetical posed to Dr. Lanier incorporated this limitation in that the ALJ asked him to assume an individual who had to avoid temperature extremes.  A.R. at 50.  Finally, after considering psychological evidence, the ALJ determined that Casner would benefit from simple, repetitive instruction.  A.R. at 20.

Casner's asserts that the ALJ's residual functional capacity assessment is based on findings of fact that are not supported by the record.  The Court turns first to the non-exertional environmental limitation relating to

27

exposure to respiratory irritants.  The ALJ expressly recognized that the SSA consultants indicated a need for Casner to avoid even moderate exposure to respiratory irritants.  A.R. at 19.  The ALJ cites to Dr. Conroy's December 2003 residual functional capacity assessment, which was affirmed by Dr. Dow.  A.R. at 216.  The section dealing with environmental limitations offers the following levels of restriction: unlimited, avoid concentrated exposure, avoid even moderate exposure, and avoid all exposure.  A.R. at 220.  With respect to respiratory irritants, namely fumes, odors, dusts, gases, poor ventilation, etc., the consulting doctors indicated that Casner must avoid even moderate exposure to such irritants, due to his severe pulmonary damage.  Id.  Despite recognizing this evidence, the ALJ, without explanation, determined that Casner must avoid only concentrated exposure to respiratory irritants.   This level of limitation is not supported by substantial record evidence and the Court cannot track the ALJ's Decision to reject the higher level of limitation recommended by Drs. Dow and Conroy.  Clearly, an ALJ must base his determinations on testimony and medical evidence in the record and "not succumb to the temptation to play doctor . . . ."  Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996).

The Government asserts that this error is harmless because most job

environments do not involve either moderate or concentrated exposure to pulmonary irritants. However, it is clear under Social Security Ruling 85-15 that when environmental restrictions fall in the mid-range, resolution of the issue will generally require additional vocational evidence, given the fact that few job environments are entirely free of irritants. In the instant case, there is no evidence that the jobs identified by Dr. Lanier would accommodate an individual who must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Thus, remand is necessary for the reconsideration of Casner's residual functional capacity on this ground.

Casner raises several other allegedly unsupported findings of fact by the ALJ, which the Court will address briefly in light of the remand. On page 4 of the ALJ's Decision, the ALJ states that Casner "does not report any side effects from his medications." A.R. at 18. Clearly, this statement is contrary to the record evidence. Casner testified at the hearing that the Methadone interfered with his activities by making it hard to concentrate and by making him feel drowsy, tired, and irritable. A.R. at 34. This testimony was consistent with Casner's representations on the daily living questionnaire that medication makes him tired, hard to concentrate, and

irritable.  <u>See</u> A.R. at 159.

Casner also takes issue with the statement in the last paragraph on page 4 of the ALJ's Decision that "claimant alleges he is disabled entirely due to his breathing condition," asserting that he has identified other conditions that also limit his ability to work.  A.R. at 18.  In making this argument, Casner mischaracterizes the ALJ's statement.  When read in context, it is clear that the ALJ was considering whether Casner remained capable of doing some level of work or whether he was entirely precluded from working.  In fact, in the second full paragraph on page 4, the ALJ notes that Casner claims to be "disabled <u>primarily</u> due to a respiratory condition." <u>Id</u>. (emphasis added).  The ALJ clearly considered Casner's other conditions in making his residual functional capacity assessment, incorporating limitations on lifting, climbing, stooping, and crouching.

Casner asserts that the ALJ gave undue weight to Casner's reported work activities and mischaracterized the extent of Casner's daily activities.  However, the ALJ's factual findings with respect to Casner's work activities are supported by the record evidence, and it is not the duty of this Court to reweigh the evidence.  Similarly, the ALJ's factual findings with respect to Casner's daily activities are supported by record evidence, although the ALJ

should note on remand that Exhibit 9E was completed prior to the amended onset date of November 3, 2003. A.R. at 137-43.

Casner also asserts that the ALJ made several factual errors in assessing his mental functioning. The ALJ rejected the SSA consultants' opinions that Casner had moderate difficulty in maintaining social functioning. See A.R. 20, 234. One of the things that the ALJ expressly relied upon in doing so was the fact that "[t]here [was] no indication of any difficulty in social interaction with his wife" during the relevant period. A.R. at 20. This statement is contrary to Casner's testimony that his irritability "had a lot to do" with his divorce, which was granted a few weeks prior to the hearing. A.R. at 46-47. The ALJ fails to address this discrepancy, a matter that should be considered on remand.

Casner contends that the ALJ also erred in concluding that his daily activities, including driving, suggested that Casner's concentration was not as impaired as he represented it to be. A.R. at 20. This conclusion is not unfounded. The record clearly reveals that Casner read as a hobby and was able to drive approximately 100 miles a month. Both of these facts support the ALJ's assessment, and again, the Court is not to reweigh evidence considered by the ALJ.

B.    Dr. Kiel's Residual Functional Capacity Assessment

In September 2005, Dr. Kiel opined in a disability assessment that Casner's low effusion capacity coupled with his COPD and partial lung resection made it "quite difficult" for Casner to perform anything other than sedentary work.  A.R. at 386.  Dr. Kiel also stated a belief that, even at the sedentary level, Casner would not be able to work forty hours a week without experiencing difficulties secondary to his COPD.  Id.  Dr. Kiel opined that during an eight-hour day, on a regular and continuing basis, Casner could sit for four hours, stand for one hour, and not walk at all.  A.R. at 389.  Dr. Kiel opined that during an eight-hour day, on a regular and continuing basis, Casner could lift up to five pounds for two hours, but could not consistently lift more than five pounds.  Id.  Dr. Kiel noted that Casner's ability to lift more than twenty pounds was limited by shortness of breath on exertion.  Id.  Dr. Kiel opined that Casner could not carry any weight consistently and could stoop for thirty minutes, kneel for sixty minutes, and crouch for forty-five minutes.  A.R. at 390-92.  Dr. Kiel indicated that Casner had been subject to these limitations at this severity since 2001.  A.R. at 392.

The ALJ expressly addressed Dr. Kiel's opinion, recognizing that, in

September 2005, Dr. Kiel "indicated that the claimant would essentially be precluded from all work activity due to difficulty with shortness of breath on exertion." A.R. at 17. Citing page 3 of the disability assessment, A.R. at 389, the ALJ wrote "[a]ccording to the doctor, the claimant could not lift any weight at all." A.R. at 17. The Court notes, however, that on page 3 of the disability assessment, Dr. Kiel opined that during an eight-hour day, on a regular and continuing basis, Casner could lift up to five pounds for two hours. A.R. at 389. The ALJ rejected Dr. Kiel's opinion that Casner was incapacitated from all work activity. A.R. at 19. In doing so, the ALJ cited as contradictory evidence Casner's own admissions, Dr. Chapa's report, and the residual functional capacity assessments of Drs. Dow and Conroy.

As the Seventh Circuit has recently reiterated, the SSA's "treating physician" rule directs an ALJ to give controlling weight to the medical opinion of a treating physician regarding the nature and severity of an impairment if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotations and citations omitted); 20 C.F.R. § 404.1527(d)(2).

However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight" but is treated as "one more piece of evidence for the administrative law judge to weigh" consistent with factors identified in 20 C.F.R. § 404.1527(d)(2). Bauer, 532 F.3d at 608. It should also be noted that the determination that an individual is disabled is one that is expressly reserved to the SAA. 20 C.F.R. § 404.1527(e)(1).

The residual functional capacity assessments of Drs. Dow and Conroy issued in December 2003 and April 2004 constitute well-supported evidence contradicting Dr. Kiel's assessment. Thus, Dr. Kiel's opinion was not entitled to controlling weight, but rather was a piece of evidence to be weighed by the ALJ. The ALJ did not err as a matter of law in rejecting Dr. Kiel's opinion. Additionally, the ALJ's decision to reject Dr. Kiel's residual functional capacity assessment is supported by the record evidence. In rejecting Dr. Kiel's opinion, the ALJ noted that Casner had continued to work well after he was exposed to anhydrous ammonia. The ALJ expressly cited Dr. Kiel's notes from July 2003, which indicated that Casner was doing fairly well as long as he avoided work in a hot, dusty environment with a lot of lifting. A.R. at 539. The ALJ further noted that Casner was

working as a gofer for his brother-in-law in August 2005.  These facts support the ALJ's conclusion and contradict Dr. Kiel's opinion that Casner had been subject to the identified limitations at the stated severity since 2001.  The ALJ also recognized that Casner had recently been able to control his condition significantly without hospitalization.  Additionally, the ALJ cited to an Activities of Daily Living Questionnaire that Casner completed on September 10, 2003, in which Casner indicated that he cooked for himself; performed weekly cleaning, vacuuming, and laundry; and monthly grocery shopping.  A.R. at 137.  On the Questionnaire, Casner also indicated that he left home two to three times a day to visit family, kept appointments, and did errands.  A.R. at 138.  The ALJ also relied upon Casner's hearing testimony that he could garden, fish, and drive a car.  Finally, the ALJ pointed to examining physician Dr. Chapa's December 2003, findings that Casner's lungs were clear and his pulmonary test results were essentially normal.

This Court must not reweigh the evidence.  Rather, the Court must determine whether the ALJ identified supporting evidence in the record and built a logical bridge from that evidence to his conclusion.  See Giles, 483 F.3d at 486.  The Court finds that the ALJ's Decision satisfies this standard.

The ALJ's Decision to reject Dr. Kiel's opinion is not so poorly articulated as to prevent meaningful review such that remand would be appropriate.

Casner also takes issue with the ALJ's statement that "[w]hen Dr. Chappa [sic] saw the claimant in December of 2003, the claimant was using only inhalers," noting that Casner was taking antibiotics and other medications for pain, depression, and anxiety.  A.R. at 19.  Casner asserts that the consulting physician, apparently Dr. Chapa, failed to note Casner's medications.  Brief in Support of Motion for Summary Judgment (d/e 16), p. 18.  However, Dr. Chapa's report clearly indicates that Casner was taking the following medications: Lorcet, Zithromax, Xanax, Celexa, and Combivent inhaler.  A.R. at 198.  The ALJ recognized that Casner used antibiotics and inhalers to manage his respiratory condition and that he took Xanax to relax and Lorcet for pain.  Moreover, the ALJ expressly recognized that Casner began taking Methadone for back pain in October 2003, and that Casner eventually used the Methadone for pain associated with his breathing condition as well.  A.R. at 18.

C.     Alleged Error at Step Five

According to Casner, the ALJ's finding at step five that Casner could perform a significant number of jobs is fatally flawed because it was based

on an erroneous assessment of his residual functional capacity. As set forth above, the matter must be remanded for reconsideration of Casner's residual functional capacity. Once that determination is properly made, the analysis should continue to consideration of step five.

THEREFORE, for the reasons set forth above, Plaintiff's Motion for Summary Judgment (d/e 15) is ALLOWED in part, and Defendant's Motion for Summary Affirmance (d/e 17) is DENIED. Plaintiff's original Motion for Summary Judgment (d/e 11) is DENIED as MOOT due to the filing at docket entry 15. The Decision of the SSA is reversed, and the matter is remanded for further proceedings consistent with the Opinion, pursuant to sentence four of 42 U.S.C. § 405(g). All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   September 12, 2008

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE